IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WILLIAM JAMES MITCHELL,          *

    Petitioner,          *

          v.          *          Civil Action No. DKC-13-2063

DEBORA DARDEN,[1] Acting Warden, et al.,          *

    Respondents.          *
                         ***

## MEMORANDUM OPINION

Presently pending and ready for resolution is Petitioner William James Mitchell's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, as supplemented, challenging his 2005 judgment of conviction in the Circuit Court for Harford County, Maryland for attempted first degree murder and related offenses.[2]  (ECF Nos. 1, 46).  Respondents initially challenged the timeliness of the motion.  (ECF No. 6).  The procedural history of this case discussed in the court's memorandum opinion and order issued on October 11, 2017, which dismissed the petition as initially filed as time-barred and granted a certificate of appealability. (ECF Nos. 31, 32).  On April 17, 2019, the United States Court of Appeals for the Fourth Circuit vacated the dismissal order and remanded the case to this court for further consideration of the petition.  *See Mitchell v. Green*, 922 F.3d 187 (4th Cir. 2019).   Thereafter, Petitioner, by his counsel, filed a supplement, Respondents filed a supplement to their limited answer, and Mr. Mitchell filed a supplemental reply.  (ECF Nos. 46, 47, 48).

---

[1]   Pursuant to Fed.R.Civ.P. 25(d), the current acting warden is substituted for the former warden at Eastern Correctional Institution, where Mr. Mitchell is housed.

[2]   *State of Maryland, v. William James Mitchell*, Case number 12-K-05-000203 (Cir. Ct. Harford Cty.).

After reviewing the filings, the court finds no need for an evidentiary hearing. *See* Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts and Local Rule 105.6; *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)).

## I. BACKGROUND

The Court of Special Appeals of Maryland summarized the case, stating:

> In 2005, a jury in the Circuit Court for Harford County convicted Mitchell of attempted first and second-degree murder of Tesheka Smythe, first and second-degree assault of Ms. Smythe, use of handgun in the commission of a felony (as to Ms. Smythe), and use of a handgun in the commission of a crime of violence (as to Ms. Smythe). The jury also convicted appellant of second-degree assault of Timothy Bishop and use of a handgun in the commission of a felony (as to Mr. Bishop). In addition, the jury convicted appellant of wearing, carrying, or transporting a handgun on or about his person; wearing, carrying, or transporting a handgun in a vehicle; unlawfully possessing, owning, carrying, and transporting a firearm after being convicted of a felony; and unlawfully possessing a regulated firearm after being convicted of a felony.
>
> The court sentenced Mr. Mitchell to a total term of seventy years' imprisonment: forty-five years for attempted first-degree murder of Ms. Smythe (count 1); ten years for use of a handgun in the commission of a crime of violence (as to Ms. Smythe) (count 11); five years for unlawfully possessing, owning, carrying, and transporting a firearm after being convicted of a felony (count 12); five years for second-degree assault of Mr. Bishop (count 6); and five years for use of a handgun in the commission of a felony (as to Bishop) (count 10). The sentences were ordered to run consecutive to each other. The court merged the remaining convictions for sentencing purposes. In 2009, the circuit court vacated the sentence for count 10, leaving a total term of sixty-five years' imprisonment.

*Mitchell v. State*, 2018 WL 775418 *1 (Ct. Sp. App. Feb. 7, 2018); ECF No. 6-2 at 2-3.

### A.    Trial

Mr. Mitchell was charged with multiple offenses for shooting his wife, Tesheka Smythe, and threatening their friend, Timothy Bishop. At the time of the incident, Ms. Smythe and Mr.

Mitchell had outstanding arrest warrants for probation violation.  Ms. Smythe waived the right to assert her marital privilege and testified against her husband. (ECF No. 46-1 at 151-156).[3]  Both Ms. Smythe and Mr. Bishop testified as witnesses for the State that Mr. Mitchell was the shooter. Mr. Mitchell, who was represented at trial by David Henninger, Esq., did not testify at trial.

The Honorable Emory A. Plitt, Jr., presided over the six-day trial at which the following facts were adduced.  On January 10, 2005, Mr. Mitchell and Ms. Smythe drove to Mr. Bishop's home in Darlington, Maryland, arriving there between 11:00 p.m. and midnight. (*Id*. at 170-173). Ms. Smythe and Mr. Mitchell were arguing before and after they arrived at Mr. Bishop's home. (*Id*. at 173, 254-255).  Ms. Smythe testified that she and Mr. Mitchell were drinking and arguing, and "drank some with Timothy."  (*Id*. at 173).  Ms. Smythe had sold cocaine to Timothy Bishop (*id*. at 223), and she had "done drugs" on the night of the shooting.  (*Id*. at 234).

Ms. Smythe told Mr. Mitchell that she "did not want to be with him anymore."  (*Id*. at 173). When she said she was going to leave him, Mr. Mitchell pulled out a gun from the front of his waistband and paced about the house.  (*Id.* at 173, 174, 257, 259).  Mr. Mitchell was "constantly lifting his waistband [sic] and saying if you don't shut up I am going to shoot you, bitch and using all kinds of derogatory words."  (*Id*. at 257-258).  After Ms. Smythe told Mr. Mitchell that she wanted a divorce, Mr. Mitchell walked into the kitchen, came back out, stood in the doorway, pointed the gun directly at her and fired.  (*Id* at 175, 258).  Ms. Smythe was hit on her right arm and left thigh.  (*Id*. at 213).  The shooting occurred sometime between 12:30 a.m. and 1:00 a.m. that morning. (*Id*. at 183).

---

[3]    Citations are to the pages assigned by the court's Case Management Electronic Case Files (CM-ECF) system filing system.

Ms. Smythe started to cry and scream.  (*Id.* at 175).  Mr. Mitchell screamed back to "shut the fuck up."  He "held the gun to [Smythe] again and told [her] to get the fuck on the ground." (*Id.*).  Ms. Smythe complied and begged him not to kill her.  (*Id.*).  Ms. Smythe crawled underneath a television stand to cover herself.  (*Id.* at 177).  Mr. Mitchell shot the gun into the floor around her.  (*Id.*).  Mr. Mitchell put his gun away, placed Ms. Smythe on the couch and apologized.  (*Id.* at 178-179).

Mr. Bishop, who was sitting on the couch next to Ms. Smythe when the shots were fired, ran upstairs.  (*Id.* at 178, 258).  Mr. Mitchell ordered Mr. Bishop to "make [his] "f-ing way back down" and "get [his] ass down."  (*Id.* at 259).  When Mr. Bishop came down, he heard a "click" which he believed was Mitchell attempting to shoot him, but the gun was either empty or misfired. (*Id.* at 262, 294-295).  "Every time Ms. Smythe would yell out," Mr. Mitchell "would get very angry" and say "shut up, bitch, or I am going to finish you off."  (*Id.* at 264).  Mr. Mitchell pointed the gun at Mr. Bishop and ordered him to find all the shell casings or he was going to finish them both off.  (*Id.* at 261-262).

About 20-25 minutes after the shooting, Mr. Bishop left the house and drove away in his car.  (*Id.* at 181, 265).  Mr. Bishop did not immediately call the police because he had an outstanding warrant.  (ECF 46-1 at 271, 289-290, 307).  Mr. Bishop testified that he did not immediately seek help from his parents who lived next door because he was afraid Mr. Mitchell might come after him.  *Id.* at 308.  He did not return to his house until 11:00 a.m.  (*Id.* at 311-312).

Mr. Mitchell and Ms. Smythe left the house but decided not to go to a hospital because both had outstanding arrest warrants.  Instead, they drove around and stayed with other acquaintances.  (*Id.* at 175, 211, 228-29, 237-238).  Ms. Smythe eventually received medical treatment in a hospital.  (*Id.* at 215).

4

On or about January 13, 2005, the police arrested Mr. Mitchell.  (*Id*. at 364).  Police found two guns, a .22 caliber Ruger and a SKS carbine and ammunition in the Nissan 300Z that Mr. Mitchell drove to and from Timothy Bishop's house.  (*Id*. at 446-448).

Mr. Bishop testified that he had not done drugs with Ms. Smythe or Mr. Mitchell that night. He said that Mr. Mitchell had brought alcohol in with him but "there was nothing to do with drugs." (ECF No. 46-1 at 290).  Mr. Bishop testified that Mr. Mitchell "might have been shook up from the cocaine he was taking that night.  Maybe that's what caused him to do the shooting."  (*Id*. at 284).  When asked about drug use at the time of the offense Mr. Bishop responded, "It had nothing to do with drugs that night.  He [Mr. Mitchell] brought a bottle of liquor in.  He seemed to be pretty booned up that night."[4]  (*Id*. at 299).

During closing arguments, defense counsel addressed the credibility of Mr. Bishop and Ms. Smythe by distinguishing the experience of the jury from these witnesses.

> But sometimes you have to just step back a minute because this is not your experience, this is not your background.  I don't think that you were doing crack cocaine last night and I seriously doubt that you do it every other day or several days a week.  I seriously doubt that you were in prison last year or that you're on parole today or probation today.  I doubt that if you were on probation you would be violating that probation and have warrants out for you. So when [the prosecutor] asks you to view this evidence in the context of your own knowledge and experiences, you really can't do that.  You really need to view this evidence in the context of these people.
> *************
> The judge told you that when you're looking at evidence and reasonable doubt, you should question whether or not you would be willing to act upon such belief without reservation in your own personal life or business life.  So, the question becomes, would you, based on the information provided by Tim Bishop and Tesheka Smythe, be willing to act without reservation?  Would you believe the word and act upon the word of Tim Bishop?

---

[4]   The court is unfamiliar with the term "booned up."  No explanation is provided in the record.

ECF No. 46-1 at 694-695.

Defense counsel remarked that witnesses had been in jail recently and are "supposedly refraining from using drugs" (*id.* at 695), "[b]ut, they continue to use drugs, to use cocaine, to use methadone, apparently mixing the two, and probably alcohol." *Id.* at 695. Defense counsel added:

> We also know that everybody is high. Now, when you talk about forming criminal intent, the intent to commit a serious offense, and when you look at what is required to find, for example, first degree murder or second degree murder, how could these people form the intent to do anything except maybe drink or party? They are all high.

*Id.* at 697.

At this point, the prosecutor asked to approach the bench and requested a voluntary intoxication instruction. *Id.* at 697-698. The court responded, "When we finish arguments we will do that." *Id.* at 698. The transcript shows that defense counsel was present at the bench conference. *Id.*

Defense counsel resumed his closing argument, stating "[s]o when we talk about the condition of these people, think about the way they are that night." (*Id.*). Defense counsel asked the jury. "Who fired the shot? That, we maintain, is a serious question." (*Id.* at 699). He reminded the jury that after Ms. Smythe was injured, Mr. Bishop left the house and did not call the police or seek help from his father who lived next door and waited until 11:00 a.m. that morning to contact the police. (*Id.* at 700). Defense counsel said, "This night, this week, in fact, this whole month of December these people's heads were spinning all the time. Not only did they use cocaine virtually every other day or every day but even after the shooting occurs they're using cocaine." (*Id.* at 706). He asked, "Are they ever straight? Do they really ever know what happened?" (*Id.*). "These people are all burnt, burnt out drug users with no credibility." (*Id.* at 706-707).

6

At the close of the defense's argument, but before the state's rebuttal, the court called the parties to the bench to continue the discussion of a voluntary intoxication instruction. The prosecutor responded "my recollection when I reviewed my notes was there was discussion about people being high. I don't think she was talking about everybody sitting around being high." (*Id.* at 718). Defense counsel responded, "That's what I recall." (*Id.*). No voluntary intoxication instruction was given to the jury.

On October 24, 2005, Judge Plitt sentenced Mr. Mitchell to a total of 70 years of incarceration, noting that he could have imposed another 23 years for Mitchell's violations of probation in his other cases; however, he "close[d] those cases out" and declined to sentence Mr. Mitchell to the additional time. (*Id.* at 82-83). Judge Plitt recounted that when he started the Drug Court Reentry Program[5] ("Drug Court"), Mr. Mitchell was one of the program's first participants.

**B.     Appeal**

On direct appeal to the Court of Special Appeals, Mr. Mitchell, by his counsel[6] raised three issues:

> 1. Did the failure of the trial judge to recuse himself violate the Maryland Rules of Judicial Conduct, and violate Appellant's Rights to Testify and to a Fair Trial in Contravention of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Articles 21, 22, and 24 of the Maryland Declaration of Rights?

---

[5]     The Re-entry Drug Court Program is designed to treat and incentivize people who have failed drug treatment programs and reoffended by providing drug testing counseling, job services, and regular follow-up with the court. After Mr. Mitchell entered Drug Court, Judge Plitt had sentenced Mr. Mitchell on May 7, 2004, to time served in three pending cases and cautioned this was his "last chance" so he should "use it wisely" or "his butt would be back in the sling." (ECF No. 46-2 at 75-77; ECF No. 47-1 at 3). Mr. Mitchell appeared before Judge Plitt for monthly status reviews required as part of Drug Court. (ECF No. 1-1 at 7-9).

[6]     Mr. Mitchell was represented by different counsel at trial, at sentencing, on appeal, and in state post-conviction proceedings.

2. Did defense counsel's failure to request a voluntary intoxication instruction deny Appellant his right to effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Articles 21 and 24 of the Maryland Declaration of Rights?

3. Did sentencing Appellant to five years imprisonment for a crime for which he was not indicted or convicted, and for which the jury was not instructed, violate Md. Rule 4-202 and deny Appellant his rights to due process and a fair trial guaranteed by the Sixth and Fourteenth Amendments in the United States Constitution and Articles 5, 21, and 24 of the Maryland Declaration of Rights?

ECF No. 6-2 at 2.

On July 27, 2007, the Court of Special Appeals, by unreported opinion, affirmed the judgment of the trial court on issues one and two, vacated the sentence on Count 10 (use of a handgun in the commission of a crime of violence against Mr. Bishop), and remanded the case for resentencing on the use of a handgun during the commission of a felony charge.[7]  On remand, the Circuit Court vacated the conviction for use of a handgun during the commission of a crime of violence because the jury had acquitted Mr. Mitchell of the underlying felony.  Mr. Mitchell was resentenced to 65 years imprisonment.  (ECF No. 1 at 4; ECF No. 6-1 at 22).

Mr. Mitchell filed a petition for a writ of certiorari in the Court of Appeals of Maryland. The Court of Appeals initially granted the petition, but later dismissed it as improvidently granted. (ECF No. 6-3).

---

[7]    Count 10 of the Indictment charged Mr. Mitchell with use of a handgun in the commission of a felony.  The trial judge instructed the jury that the relevant felony was first degree assault against Mr. Bishop and for conviction, the State must prove that the defendant committed the felony and used a handgun in committing the felony.  (ECF No. 44-1 at 666).  The jury acquitted Mr. Mitchell of the underlying felony against Mr. Bishop, but convicted him of use of a handgun during the commission of a felony.  The trial judge initially sentenced Mr. Mitchell to five years for use of a handgun in the commission of a crime of violence against Mr. Bishop rather than in the commission of a felony against Mr. Bishop. (ECF No. 6-2 at 25-26).

C.      **Post-Conviction Proceedings**

In his petition for post-conviction relief, Mr. Mitchell's arguments included that trial counsel provided ineffective assistance by presenting a theory of the case that he knew was unsupported by the evidence, and trial counsel should have been prepared for the possibility that Ms. Smythe would testify against her husband.  (ECF No. 18 at 17-18).  Mr. Mitchell argued that if trial counsel had developed evidence about intoxication, he could have requested a voluntary intoxication instruction which could have resulted in a conviction to a lesser offense. (*Id.*).

Seven claims of ineffective assistance of trial counsel were presented for post-conviction review:

> 1. Did trial counsel render ineffective assistance in failing to properly move that Judge Plitt recuse himself and instead raising the issue in an informal letter?
>
> 2. Did trial counsel render ineffective assistance in failing to object to the admission of highly prejudicial evidence that was not relevant to the crimes with which Petitioner was charged or for which a proper foundation had not be[en] laid?
>
> 3. Did trial counsel render ineffective assistance in failing to impeach States witnesses Tesheka Smythe and Timothy Bishop, for bias and motive to testify falsely?
>
> 4. Did trial counsel render ineffective assistance in putting forth a defense theory of the case that trial counsel knew was not supported by the evidence?
>
> 5. Did trial counsel render ineffective assistance in failing to investigate and prepare for trial by failing to visit the alleged scene of the crime and failing to have the photographs of Tesheka Smythe's wounds analyzed by an expert?
>
> 6. Did trial counsel provide ineffective assistance by failing to object to the court's flawed jury instruction regarding the unanimity requirement? [8]

---

[8]     Mr. Mitchell withdrew this claim when it was discovered the correct instruction was given; the error was in the trial transcript. (ECF No. 46-4 at 3).

> 7. Did the cumulative effect of trial counsel's errors deny Petitioner his Sixth Amendment right to the effective assistance of counsel?

Post-Conviction Petition. (ECF No. 46-3 at 5-6).

On July 9, 2010, Mr. Mitchell and trial counsel, David Henninger, testified at the post-conviction hearing presided over by the Honorable Thomas E. Marshall.  (ECF No. 46-4).  On November 3, 2010, the post-conviction court issued a memorandum and order denying post-conviction relief.  (ECF No. 46-5).  The Court of Special Appeals summarily denied Mr. Mitchell's application for leave to appeal. (ECF No 6-4).

**D.     Petition and Supplement**

In his federal petition as initially filed, Mr. Mitchell claims that he received constitutionally ineffective representation because trial counsel:  (1) "put[] forth a defense theory of the case that trial counsel knew was not supported by the evidence"; (2) failed to object to the admission of "prejudicial evidence"; and (3) failed to move properly for Judge Plitt to recuse himself.  (ECF No. 1 at 5-6).  Further, he asserts that he is entitled to habeas relief because of (4) Judge Plitt's failure to recuse himself; *Id.* at 5-6; and (5) the cumulative effect of trial counsel's representation. (*Id.* at 7).  In the supplement to the Petition, Mr. Mitchell adds to this claim "that trial counsel rendered ineffective assistance of counsel by pursuing a theory of defense that he knew was not supported by the evidence," asserting that counsel failed "to pursue a voluntary intoxication defense, which was both supported by the evidence and could have been strengthened by investigation and cross-examination." (ECF No. 46 at 1, 13-27).

## II.  STANDARD OF REVIEW

### A.        § 2254 Habeas Review

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings."  *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005).  The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v Woodall*, 572 U.S.415, 419-20 (2014), quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits:  (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(a).  A state adjudication is "contrary to" clearly established federal law under § 2254(d)(1) where the state court "arrives at a conclusion opposite to that reached by the [Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme] Court."  *Williams v. Taylor,* 529 U.S. 362, 405 (2000).  Under the "unreasonable application analysis," a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of

the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough. v Alvarado*, 541 U.S. 652, 664 (2004)).  In other words, "a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

Under section 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).  "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal court may not conclude that the state court decision was based on an unreasonable determination of the facts.  *Id*. This standard was "meant to be" one that is "difficult to meet...." *Richter*, 562 U.S. at 102.

Further, the habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1) "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010).  This is especially true where the state court has "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*.

### B.    Ineffective Assistance of Counsel

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  The "right to counsel is the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  In *Strickland*, the Supreme Court explained that to show constitutionally

ineffective assistance of counsel, a petitioner must show both deficient performance and prejudice—that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *id*. at 687, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

To satisfy the performance part of the *Strickland* standard, a petitioner must demonstrate that counsel's performance was not "within the range of competence normally demanded of attorneys in criminal cases." *Id*. at 687. A petitioner must show that the attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Strickland*, 466 U.S. at 688; *see Harrington v. Richter*, 562 U.S. 86, 104 (2011); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017). "Judicial scrutiny of counsel's performance must be highly deferential" and not based on hindsight. *Stokes v. Stirling,* _ F.4th _, 2021 WL 3669570 at * 6 (4th Cir. August 19, 2021) (citing *Strickland,* 466 U.S. at 689). The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 88 (quoting *Strickland,* 466 U.S. at 690).

Further, a petitioner must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689), *see also Harrington*, 562 U.S. at 109 (2011) ("There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect.") (citations and internal quotation marks omitted). The adequacy of counsel's investigation informs the strength of the presumption of strategy. *See Stokes*, 2021 WL 3669570 at * 7(quoting *Strickland*, 466 U.S. at 690–91

("[S]trategic choices made after less than complete investigations are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). Under the Sixth Amendment, a defendant "has a right to effective representation, not a right to an attorney who performs his duties 'mistake-free.'" *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017) (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006)).

"The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 788(internal citations omitted). "When §2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

The second or prejudice part of the *Strickland* standard considers whether counsel's errors were so serious that they deprived the defendant of a fair trial whose result is reliable and that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 690-94. "The likelihood of a different result must be substantial, not just conceivable," *Harrington*, 562 U.S. at 112 (citation omitted), so as to "undermine confidence in the outcome" of the trial, *Strickland*, 466 U.S. at 694. "The benchmark of an ineffective assistance claim must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Id*. at 686. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Rather, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. A determination need not be made concerning the attorney's performance if no prejudice would have resulted had the attorney been deficient. *See id*. at 697.

### III.  DISCUSSION

Mr. Mitchell contends that he is entitled to federal habeas relief because the trial judge's failure to recuse himself and trial counsel's deficient representation violated his right to testify and to a fair trial in contravention of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.  ECF Nos. 1, 46.

### A.      Trial Court Error for Failure to Recuse

Mr. Mitchell raises the same claims of trial court error and ineffective assistance based on trial counsel's failure to file a motion for Judge Plitt to recuse himself as he did on post-conviction review.

On direct appeal, the Court of Special Appeals found the issue of trial court error was never properly before Judge Plitt and was unpreserved for appeal.  After Judge Plitt was assigned to preside at Mr. Mitchell's trial, the State's Attorney and trial counsel David Henninger separately sent letters to Judge Plitt.  In a letter dated February 16, 2005, Joseph A. Cassilly, the State's Attorney for Harford County, wrote to Judge Plitt that Mr. Mitchell and Ms. Smythe were his "drug court probationers," this could pose "possible problems and appellate issues."  Mr. Cassilly also expressed "concern regarding whether Ms. Smythe, and should she elect to testify, Mr. Mitchell, would feel free to testify before him and without reservation," as to facts involving "drug abuse or other criminal violations which would unquestionably violate your Honor's probation orders."  (ECF No. 1-2).  Mr. Cassilly added "[t]here may also be issues regarding your knowledge of the subjects from drug court briefing."  (*Id*.).

In his letter dated March 30, 2021, Mr. Henninger wrote to Judge Plitt:

> This office joins in request by the State, for Your Honor to kindly recuse yourself from hearing the above caption case.  This request is based off the fact that Your Honor has presided over the

15

> defendant's numerous prior cases and will be hearing his four open
> violation of probation cases (listing cases).

(ECF No. 1-4).

In a letter dated February 22, 2005, Judge Plitt responded to Mr. Cassilly that Mr. Mitchell had a potential violation of probation pending in drug court cases, but action on the matter was deferred until after the new case was decided.  (ECF No. 1-3 at 2).[9]  Judge Plitt stated:

> Whether or not Mr. Mitchell and Ms. Smythe choose to testify
> would be a matter they would need to discuss with their respective
> attorneys.  I am not prepared to speculate at this point about whether
> they will or won't and their possible motivation.
>
> I am unaware of any "new" case involving Ms. Smythe.   She
> likewise has a Violation of Probation case pending which has also
> been put on hold.
>
> I have no knowledge of the new case against Mr. Mitchell with the
> exception that I did a bail review after he was arrested.
>
> If either the State or Mr. Mitchell wish to ask me to recuse myself,
> then either of you can file an appropriate Motion.

ECF No. 1-3 at 2-3.  No formal motion for Judge Plitt's recusal was filed.

In rejecting the claim of trial court error on direct appeal, the Court of Special Appeals found that because Mr. Mitchell did not move for recusal under the Maryland Rules, the issue was never properly before Judge Plitt and the issue was unpreserved.[10]   Respondents assert this determination constitutes an independent and adequate state ground to reject this claim.  (ECF No. 47 n. 12).

---

[9]   Copies of the letter were sent to counsel for Mr. Mitchell and Ms. Smythe.  (ECF No. 1-2).

[10]   *See* Md. Rule 4-252(d) (providing "[a]ny other defense, objection, or request capable of determination before trial without trial of the general issue shall be raised by motion filed at any time before trial).

"Federal habeas courts may not consider a § 2254 claim if a state court disposed of the claim on adequate and independent state grounds unless the habeas applicant can demonstrate cause and prejudice or a fundamental miscarriage of justice." *Wilson v. Moore*, 178 F.3d 266, 272 (4th Cir. 1999). Thus, this claim may not be considered unless there is (1) both cause for the default and prejudice resulting from the alleged violation of federal law; or (2) that failure to consider the claim on the merits would result in a fundamental miscarriage of justice, *i.e.*, the conviction of one who is actually innocent. *See Murray v. Carrier*, 477 U.S 478 495–96 (1986); *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998) ("If a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim.").

Mr. Mitchell shows no objective factor "external to the defense" that impeded the filing of a recusal motion, to show "cause" for the default. *See Murray*, 477 U.S 488. (ECF Nos. 1, 46, 48). According to defense counsel's credited testimony at the post-conviction hearing, Mr. Mitchell discussed the issue with counsel and decided that he wanted Judge Plitt to hear his case. (ECF No. 46-4 at 20). Having admitted to shooting Ms. Smythe at the post-conviction hearing (ECF No. 46-4 at 12, 14), Mr. Mitchell cannot maintain that there has been a fundamental miscarriage of justice.

Further, the Court of Special Appeals observed that the reasons trial counsel provided in his letter requesting Judge Plitt's recusal were insufficient to warrant disqualification. (ECF No. 50-1 at 16-18). The first reason, that Judge Plitt had presided over the defendant's numerous prior cases, was not a valid ground to disqualify a judge from presiding over a jury trial. *Id.* at 18 (citing *See Nash v. State*, 69 Md. App. 681, 686, 519 A.2d 769, 771 (1987) (a judge who had presided

over a previous, related trial resulting in the defendant's conviction on similar charges was not required to recuse himself.). The second reason, that Judge Plitt would in the future be hearing Mr. Mitchell's open violation of probation cases, standing alone did not support disqualification because there was no explanation why the judge could not be fair to Mr. Mitchell. (*Id*. at 18-19).

The reasons Mr. Mitchell presented for recusal in his reply brief on direct appeal were also deemed insufficient for recusal. As summarized by the Court of Special Appeals, these reasons were that Judge Plitt: 1) had extensive information about Mr. Mitchell and Ms. Smythe, from his "off-the-bench" participation in the Drug Court; 2) was going to sit at the probation revocation hearings for Mr. Mitchell and Ms. Smythe, and this "directly affected" Mr. Mitchell's decision not to testify and may have affected the substance of Ms. Smythe's testimony; 3) started the Drug Court and had "personally taken risks in creating that program" and admitting Mr. Mitchell into it; and 4) warned Mr. Mitchell that if he failed in the program, "his butt would be back in a sling." (ECF No. 50-1 at 21). Additionally, Mr. Mitchell argued the use of sentencing information "not available to him," the trial judge's personal involvement in the Drug Court and its decisions, the direct impact on his and Ms. Smythe's testimonial decisions, the trial judge's role in the revocation of probation proceedings, and the trial judge's "pre-commitment to punish" him for violating probation, in the aggregate established that the trial judge lacked the "[a]ppearance of disinterestedness and impartiality," *Scott v. State*, 110 Md. App. 464, 487 (1996) or at least, that "the judge's impartiality might reasonably be questioned." Md. Rule 16-813, Canon 3D(1) of the Maryland Code of Judicial Conduct. ECF No. 6-2 at 21.[11]

Rejecting these arguments, the Court of Special Appeals stated:

---

[11] To the extent Mr. Mitchell raises a state law claim, the claim is not cognizable on federal habeas. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

It probably is true that Judge Plitt, prior to trial, had "extensive information" about Smythe and appellant, and both were persons whom Judge Plitt thought deserved a "last chance." But nothing in the record supports the assertion that this information was acquired by Judge Plitt's "off-the-bench" participation in the drug program. Insofar as reflected in the record, the information was acquired during the mandatory once-per-month status hearing where persons were brought back to court so that updated status reports could be obtained.  In his brief, appellant emphasizes that (1) his decision to not testify in his own defense was influenced by the fact that, if he did testify, he would have to reveal the fact that he had been taking cocaine while on probation, which was an admission he did not want to make in the presence of the judge who had placed him on probation and who had the power to revoke that probation and impose a sentence of up to twenty-three years for the violation and (2) the fact that Smythe also faced violation-of-probation charges before Judge Plitt "might well have affected the substance of" her testimony.:

There is nothing in the record to support the allegation that the substance of Smythe's testimony was in any way affected by the fact that Judge Plitt presided at trial.  And, in any event, at no time prior to trial did Judge Plitt know anything about the facts surrounding the charges.  In other words, he did not know that if either Smythe or [Mr. Smith] testified truthfully they would admit to probation violations.

It should be remembered that neither the prosecutor nor defense counsel made any affirmative representation to the court that if either appellant or Ms. Smythe were called as witnesses they would testify as to any drug abuse on their part or as to the commission of any crimes that they had committed while on probation.  If counsel felt that such testimony would in fact be introduced and that the rights of either the defendant or the State would be prejudiced, counsel should have filed a motion demanding the judge's recusal and setting forth this as a ground.

(*Id.* at 21-23).  Regarding Judge Plitt's warning at Drug Court that [Mr. Mitchell's] "butt would be in a sling," this presumably meant he would be in serious trouble.  (*Id.* at 23; ECF No. 46-2; ECF No. 47-1; *see also supra* n. 5).  The appellate court characterized such warnings as "given routinely by judges" when electing to suspend all or part of a sentence and "nothing more than statement of the obvious." (ECF No. 50-1 at 23).  Such warnings "do not show prejudice or

constitute grounds upon which a judge's impartiality (in a separate case), might be reasonably questioned." (*Id*.).

> Looking at the recusal issue (prior to trial) from Judge Plitt's viewpoint, if [Mr. Mitchell] were convicted in the subject case -- no matter who presided at the trial - [Mr. Mitchell] would be back in serious trouble.  And, as far as the violation of probation was concerned, even if some other judge had presided at the subject trial, a conviction would count as a violation of a condition of probation ("obey all law") that could not have possibly escaped Judge Plitt's attention when the hearing on revocation of probation occurred. In other words, no matter who presided at the case at issue, appellant's "butt would be back in a sling" in regard to the violation of probation charges.  On the other hand, no matter who presided at the jury trial, an acquittal could not have constituted a violation of probation.

(*Id*. at 24-25). [12]

The Court of Special Appeals also rejected Mr. Mitchell's request to apply the Plain Error Doctrine, explaining that failure to object before trial generally precludes appellate review because ordinarily appellate courts will not address claims of error which have not been raised and decided in the trial court.  (*Id*.).  The appellate court determined that the recusal issue was not a "blockbuster error" or the type of error that prevented Mr. Mitchell from receiving a fair trial.  (*Id*. at 25).  Rather, the appellate court determined that the record showed that Mr. Mitchell had received a fair trial "in every respect," and noted that immediately after sentencing and the closing out of his

---

[12]  At Mr. Mitchell's monthly status reviews, Judge Plitt encouraged Mr. Mitchell's positive progress with comments such as "you're off to a very, very good start" and "keep up the good work." (ECF No. 47-2 at 6; ECF No. 47-3 at 11) and warned that if he restarted using controlled dangerous substances Mr. Mitchell was "going to be a middle aged man by the time I get through with you if you screw up one more time" and "[i]f I find out from this moment forward that you are in any way involved in providing controlled dangerous substances to anybody else or helping anyone distribute controlled dangerous substances, you are going back to jail and I am going to throw away the key." (ECF No. 47-4 at 5, 9).  On November 9, 2004, when Mr. Mitchell informed Judge Plitt that he had relapsed (*Id*. at 3), Judge Plitt imposed 14 days of incarceration for violating probation, but did not terminate him from the program, granted his request to live at a particular halfway house (*id*. at 8) and cautioned that this was "strike two" and "screw up again, you're out." (*Id*. at 9).

violation of probation cases, Mr. Mitchell thanked Judge Plitt for his "mercy." (*Id*. at 25-26; ECF No. 46-2 at 83).

The Circuit Court for Harford County rejected the same claim of trial court error on post-conviction review and concluded "nothing in the record" supported Mr. Mitchell's claims that his testimony was "inhibited by Judge Plitt's presence." (ECF No. 46-5 at 8).

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). "Due process guarantees 'an absence of actual bias' on the part of a judge." *Williams v. Pennsylvania*, 136 S.Ct. 1899, 1905 (2016) (quoting *Murchison*, 349 U.S. at 136). "But our system of law has always endeavored to prevent even the probability of unfairness." *Murchison,* 346 U.S. at 136.   The question is "not only whether there was actual bias on [the court's] part, but also whether there was 'such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused.'" *Taylor v. Hayes*, 418 U.S. 488, 501 (1974) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 588 (1964)).

However, "it is also clear that judicial disqualification based on a likelihood or an appearance of bias is not always of constitutional significance." *Railey v. Webb*, 540 F.3d 393, 400 (6th Cir. 2008).   This is "because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard." *Bracy v. Gramley,* 520 U.S. 899, 904 (1997) (citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986)).   "But the floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Id*. (citations omitted). In order to prevail in a deprivation of due process claim, a [petitioner] must show a level of bias that made 'fair judgment impossible.'" *Rowsey v. Lee,* 327 F.3d 335, 341 (4th Cir. 2003) (citation

omitted).  Further, courts "[o]rdinarily ... presume that public officials have properly discharged their official duties." *Bracy*, 520 U.S. at 909 (citation omitted).  As such, there is "a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

In this analysis, the court is mindful of the high degree of deference that must be accorded state court rulings on habeas corpus review.  This issue was reviewed by the Court of Special Appeals on direct appeal, which found that it was never properly before the trial court and unpreserved for appeal, rejected the arguments Mr. Mitchell presented to demonstrate recusal was warranted, and declined to exercise its discretion to review the unpreserved issue for plain error. The issue was again considered in the context of Mr. Mitchell's ineffective assistance of counsel claim by the post-conviction court which rejected the claim after holding an evidentiary hearing. Mr. Mitchell's application for leave to appeal the post-conviction court's decision was denied. This court may not grant habeas relief unless it finds that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1).  The state court findings are presumptively correct and withstand scrutiny pursuant to 28 U.S.C. § 2254(d) and (e).  Moreover, the state court's determination is well supported by the record.  The court finds no error in the state court's determination, and Mr. Mitchell does not meet his burden to show that he was deprived of a fair trial.  Accordingly, the state court decision as to this claim withstands scrutiny under federal habeas review and is denied.

B.    **Ineffective Assistance Claims**

1.  **Failure to File a Motion for Recusal**

Mr. Mitchell and trial counsel David Henninger gave contradictory testimony during the post-conviction hearing about this issue.  Mr. Mitchell testified that he told trial counsel that he "wasn't going to have the freedom of testifying in front of Judge Plitt.  The man told me that he was going to put me away forever if I admitted to anything dealing with controlled dangerous substances." (ECF No. 46-4 at 9).  Mr. Mitchell further recalled that he told Mr. Henninger that he wanted to testify, and trial counsel responded that he would file a motion for Judge Plitt to recuse himself.  (*Id*.).

Mr. Henninger testified that at first Mr. Mitchell did not "think Judge Plitt would be a good judge to have since he already knew" his history and probation status, but he changed his mind after they discussed the possible alternative of a different judge hearing the case.  (*Id*. at 19).  Mr. Henninger "recommended seriously that [Mr. Mitchell] stay with Judge Plitt because Judge Plitt is a very fair judge," who he believed "would be good in a case like this." (*Id*. at 20).  Trial counsel added, "I quite honestly thought we might reach a point to work something out and the violation would be a part of that deal." (*Id*. at 20).  After discussing the options, Mr. Mitchell decided to proceed with Judge Plitt.  (*Id*. at 20, 23, 24).[13]  Mr. Henninger testified that he would have filed a motion in open court for Judge Plitt to recuse himself had Mr. Mitchell decided otherwise.  (*Id*. at 23).  The post-conviction court credited Mr. Henninger's testimony in deciding that his representation was based on acceptable trial strategy and did not amount to ineffective assistance.  (ECF No. 46-5 at 9).  Testimony revealed that a plea agreement for 20 years with no time imposed

---

[13]   Trial counsel indicated that sometime after he had written the letter to Judge Plitt asking for his recusal, and discussing the options with his client, Mr. Mitchell decided the better course was to stay with Judge Plitt.  (ECF No. 46-4 at 23).

for violations of probation was in fact negotiated, although it was rejected by Mr. Mitchell against

the advice of counsel.  (ECF No. 46-4 at 10, 19, 27).  The post-conviction court concluded:

> The court finds the testimony of trial counsel on this point to be
> creditable, and under the circumstances, acceptable trial strategy.
> Petitioner has failed to overcome the well-established principle that
> there is a strong presumption that, under the circumstances, the
> challenged action, i.e. failure to seek recusal of Judge Plitt, might be
> considered sound trial strategy.  The burden of proving an allegation
> of error is on the Petitioner, and here he failed to meet his burden.

(ECF No. 46-5 at 9.).

The state post-conviction court's determination that trial counsel's representation was

based on sound trial strategy and professional judgment is supported by the record and entitled to

the highly deferential review under the habeas statute and as interpreted by case law.  After

reviewing the record, including the trial and post-conviction hearing transcripts, the court

concludes that state post-conviction court's decision was not based on an unreasonable application

of federal law, that it was based on a reasonable determination of the facts, and that it correctly

and reasonably applied the *Strickland* standard.  As there is no demonstration of constitutionally

deficient representation, the state court decision will not be disturbed, and habeas corpus relief will

be denied as to this claim.

### 2.  The Theory of Defense was Unsupported by the Evidence

Trial counsel's theory of the case was that Mr. Bishop, and not Mr. Mitchell, shot Ms.

Smythe.  (ECF No. 46-4 at 26, 27).  Mr. Mitchell argues this theory was unreasonable professional

judgment because trial counsel was aware that Mr. Bishop would testify that Mr. Mitchell shot

Ms. Smythe and was "banking" on Ms. Smythe invoking her marital privilege and not testifying.

(ECF No. 1-1 at 38).  In the supplement to the Petition, Mr. Mitchell asserts that it was not

reasonable for trial counsel to pursue the "he didn't do it" defense when counsel acknowledged

that it "really wasn't any defense," and should have developed a viable defense of voluntary intoxication.  (ECF No. 46 at 14).

On direct appeal, Mr. Mitchell raised a claim of ineffective assistance of trial counsel for failure to request a voluntary intoxication instruction, which the Court of Special Appeals declined to decide.  (ECF No. 10-1).  Recognizing that ineffective assistance of counsel arguments typically should be made at post-conviction hearings, not on direct appeal, and there may be "exceptional cases where the trial record reveals counsel's ineffectiveness to be 'so blatant and egregious' that review on [direct] appeal is appropriate," the court determined that this case did not present "blatant or exceptional" circumstances.  (ECF No. 50-1 at 10, quoting *Mosley v. State*, 378 Md. 548, 562 (2003)).  The court also noted that "if counsel had segued to a voluntary intoxication argument after trying to convince the jury that the State's witnesses were not truthful when they said [Mr. Mitchell] shot Ms. Smythe, "the force of his original argument would have been materially diluted."  (ECF No. 10-1 at 11).

In its decision denying relief, the post-conviction court observed that Mr. Mitchell "went to great lengths" at the evidentiary hearing to testify about the "copious amounts of alcohol and cocaine" that he had consumed immediately before arriving at Mr. Bishop's house.  He testified that he consumed so much alcohol and drugs that he became unconscious and lost control of the car he was driving.  (ECF No. 46-5 at 14; ECF No. 46-4 at 11).  Mr. Mitchell testified that he was "three sheets to the wind" and had told trial counsel as much.  (*Id.*).

Trial counsel testified that he had decided against presenting a voluntary intoxication defense for several reasons.  First, Mr. Mitchell told him that he was not intoxicated at the time of the offense.  (*Id.* at 20, 25).  Second, the evidence in the record did not support that Mr. Mitchell was intoxicated.  (*Id.* at 25).  Third, although a successful voluntary intoxication defense might

have undermined the attempted murder charges, it would not have prevented a guilty verdict on

the assault and gun possession/use charges, nor would it have prevented the imposition of 23 years

of incarceration for violating his probation in other cases upon conviction.  (*Id.* at 25, 27).  Finally,

Mr. Mitchell had insisted on "an absolute not guilty" so that pursuing an inconsistent voluntary

intoxication defense would have been inconsistent with his client's stated wishes.  (*Id.* at 20, 27).

The post-conviction court credited trial counsel's testimony, stating:

> According to Mr. Henninger's testimony at the post-conviction
> hearing, he did not pursue a voluntary intoxication defense because
> the evidence did not support it.  Mr. Henninger stated that Petitioner
> told him consistent with Ms. Smythe's testimony, that they
> consumed only a small amount of alcohol or cocaine that night.  ECF
> No. 46-5 at 14.  Mr. Henninger's testimony appears to be credible
> in this regard.  He is an experienced trial attorney, well versed in
> criminal law, and it is hard to fathom that if a legitimate voluntary
> intoxication defense existed, that he would not have pursued it on
> behalf of his client.

ECF No. 46-5 at 14.

The post-conviction hearing transcript supports the state court's determination.  Mr.

Henninger testified that Mr. Mitchell had admitted to him that he had shot Ms. Smythe.  (ECF No.

46-4 at 11, 18).  Asked whether he had discussed a voluntary intoxication defense with his client,

trial counsel testified:

> I knew that there was an allegation that he had something to drink
> that day.  And I know that his wife, Ms. Smythe, had told the police
> officers that they had had, I think she put it a small amount of alcohol
> that day.
>
> There was never indication from Mr. Mitchell that he was drinking
> heavily or was intoxicated that day.  He never alleged this and I
> don't think that was the case at all.

(ECF No. 46-4 at 20).

A federal habeas court has "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.  Rather, for a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear."  *Merzbacher v. Shearin,* 706 F.3d 356, 364 (4th Cir. 2013) (citations and internal quotation marks omitted)).  The findings of fact made by a state court are not only entitled to the presumption of correctness, 28 U.S.C. § 2254(e)(1), which may be overcome only by "'clear and convincing evidence to the contrary,'" *Wilson v. Ozmint,* 352 F.3d 847, 858 (4th Cir. 2003) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)), but here they are amply supported by the record.  As the record demonstrates, there was little evidence that Mr. Mitchell was intoxicated at the time of the shooting and, Mr. Mitchell told trial counsel that he was not intoxicated that night.  Trial counsel instead decided to attack the credibility of the witnesses who testified against his client and attempted to cast blame on Mr. Bishop.  Mr. Mitchell has shown no cause to discount the post-convictions court's credibility determination, and this court can find no basis in the record to overturn the state court decision.

### 3.  Failure to Object to the Admission of Prejudicial Evidence

At trial, two rifles and ammunition were found in the Nissan 3000z automobile Mr. Mitchell drove before and after the shooting, two guns, a 22 caliber Luger and SKS carbine and ammunition were admitted into evidence without objection from the defense.  (ECF No. 46-5 at 13, ECF No. 46-4 at 6).  Mr. Mitchell contends trial counsel rendered ineffective assistance by failing to raise an objection. (ECF No. 1-1 at 40-41).  Mr. Mitchell asserts that trial counsel's strategy of letting the guns into evidence was inconsistent with "the defense that trial counsel gave during trial" because counsel made no reference to the car, guns, or ammunition in his opening statement or examination of Ms. Smythe or Mr. Bishop.  (ECF No. 1-1 at 40).  Further, Eric

Nelson, a witness at the post-conviction hearing, testified that had he been asked he would have acknowledged his ownership of the guns. (ECF No. 46-4 at 6). The post-conviction court found Mr. Nelson's testimony "on its face was incredible when considering that his admission to owning firearms would have subjected him to prosecution because he was a convicted felon." (ECF No. 46-5 at 13).

Trial counsel testified that he did not object because the theory of the defense was that Timothy Bishop shot Ms. Smythe and the gun used to shoot her was Bishop's gun or was Bishop's father's stolen gun and a jury might be more likely to believe that Mr. Bishop was the shooter. (ECF No. 46-4 at 20). Trial counsel stated "the fact that Mr. Mitchell had his own guns, which could have been used, was important" to show the jury that "it was not [Mitchell's] gun, it wasn't him, that in fact, it was Mr. Bishop with his gun that committed the crime." (*Id*.). In addition, trial counsel stated that there was "no basis to object" because the guns and ammunition were admissible to establish Mr. Mitchell's guilt with respect to the illegal gun possession charges in the Indictment. (*Id*.). Additionally, trial counsel testified that he had no knowledge that the guns did not belong to Mr. Mitchell. (ECF No. 46-5 at 13; ECF No. 46-4 at 20).

The post-conviction court concluded that Mr. Mitchell "failed to show trial counsel's failure to object was not sound trial strategy given the theory of the defense to deflect blame to Mr. Bishop or to show the inadmissibility of the weapons evidence in view of the illegal possession charge." (ECF No. 46-4 at 10).

The post-conviction court's denial of this claim was neither an erroneous nor an unreasonable application of clearly established federal law to the facts of the case. 28 U.S.C. § 2254(d)(1). Further, the court did not unreasonably determine the facts in light of the evidence

presented at the post-conviction hearing.  28 U.S.C. § 2254(d)(2).  Accordingly, habeas relief will

be denied as to this claim.

### 4.  Cumulative Effect of Trial Counsel's Errors

Mr. Mitchell's final claim is that the cumulative effect of the preceding denied him

effective assistance of counsel and a fair trial and entitles him to federal habeas relief.  In the

Fourth Circuit, courts generally do not recognize cumulative error arguments because "legitimate

cumulative-error analysis evaluates only the effect of matters actually determined to be

constitutional error, not the cumulative effect of all of counsel's actions deemed deficient." *Fisher*

*v. Angelone*, 163 F.3d 835, 853 n.9 (4th Cir. 1998); *see also Arnold v. Evatt*, 113 F.3d 1352, 1364

(4th Cir. 1997); *Higgs v. United States*, 711 F. Supp. 2d 479, 552 (D. Md. 2010).  Mr. Mitchell

presents no argument to the contrary.  This claim provides no basis to disturb the state court's

ruling.

### IV.  CERTIFICATE OF APPEALABILITY

A certificate of appealability may issue "only if the applicant has made a substantial

showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, 137

S.Ct. 759, 773 (2017).  The petitioner "must demonstrate that reasonable jurists would find the

district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*,

542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues

presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537

U.S. 322, 327 (2003).  Because the court finds that there has been no substantial showing of the

denial of a constitutional right, a certificate of appealability shall be denied.  *See* 28 U.S.C.

§ 2253(c)(2).  Mr. Mitchell has not made the requisite showing.  Accordingly, the court declines

to issue a certificate of appealability.  He may request that the United States Court of Appeals issue such a certificate.  *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003).

## V.  CONCLUSION

Having examined the state court decisions and trial record, the court concludes that the state court's rejection of Mr. Mitchell's asserted claims was neither contrary to clearly established federal law nor involved an unreasonable application of federal law pursuant to 28 U.S.C. § 2254(d).  For the reasons stated above, the petition is denied and the court declines to issue a certificate of appealability.  A separate order follows.

September 13, 2021                                                              /s/
                                                DEBORAH K. CHASANOW
                                                United States District Judge